**Charles F. Dunbar, Appellant, v. Warren Springer et al., Appellees.**

### Gen. No. 16,446.

CONTRACTS—*effect of ratification of manner of performance.* Even though performance of a contract is not such as a party is entitled to, yet if he ratifies the performance as made having full knowledge of all the facts and of the extent of his interest, he cannot subsequently complain.

Bill in chancery. Appeal from the Superior Court of Cook county; the Hon. ARTHUR H. CHETLAIN, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1910. Affirmed. Opinion filed March 12, 1912.

GEORGE U. SPUNNER and H. N. BELL, for appellant.

CHARLES L. BARTLETT, SHERMAN C. SPITZER, SEYMOUR EDGERTON, THOMAS W. PRINDEVILLE and DOUGLAS C. GREGG, for appellees.

MR. PRESIDING JUSTICE BALDWIN delivered the opinion of the court.

On the 18th of March, 1908, appellant, Charles F.

Dunbar, filed a bill in the Superior Court of Cook County, against Warren Springer, James B. Brougham, and the Chicago Title & Trust Co., appellees, the objects of which were:

1.    To set aside a settlement of Dunbar's against Springer as carried out and acted upon under an escrow agreement, dated November 30, 1904.

2.    To revive the notes representing Dunbar's claim, which had been canceled by the Chicago Title & Trust Co. under the escrow agreement.

3.    To have delivered up for cancellation the release of Dunbar's claim against Springer which the Chicago Title & Trust Co. had delivered to him.

4.    To obtain a personal decree against the defendant for the amount of Dunbar's claim,—against Springer as upon the original claim as revived; as against Brougham upon his agreement with Springer in writing to pay Dunbar's claim among others; and against the Chicago Title & Trust Co. for its improper cancellation of Dunbar's trust notes without authority, in failing to follow the terms of the escrow agreement.

Answers were filed by the several defendants, and an extended hearing had before the Chancellor, who entered a decree dismissing the bill for want of equity, from which decree Dunbar appeals to this court.

From the pleadings and proof, it appears that on the 26th of December, 1903, Dunbar loaned Springer $4,362.75, and took his judgment note therefor, bearing six per cent interest. About the 13th of July, 1904, Springer induced Dunbar to exchange this note for three other notes of Springer's, each for $2,133.33, for which he pretended to give security upon certain land in the state of Kentucky. Dunbar subsequently ascertained that Springer owned no land in Kentucky, and the alleged security was fraudulent, and he so notified Springer, who had then about consummated an arrangement with a number of his creditors to accept notes, aggregating $72,000, for his indebtedness to

them, secured on property in Chicago by deed of trust to the Equitable Trust Company. Springer offered to Dunbar four of these notes, each for $1,108.14, Numbered 5, Series A. B. C. & D. respectively, which notes, it was alleged, were subsequently improperly canceled by the Chicago Title & Trust Company.

At the time of the transaction, Springer's total indebtedness was about $500,000. On April 4, 1904, the bankruptcy court adjudged him solvent, and the bankruptcy proceedings, then pending against him, were dismissed. He was said to then own property worth at least $100,000 in excess of his liabilities. On September 17, 1904, Springer conveyed certain property to Brougham in consideration of his agreement, among other things, that Brougham would satisfy and cause to be released the trust deed to the Equitable Trust Company, securing the $72,000 of trust notes of which four had been assigned to Dunbar. In pursuance of this agreement with Springer, Brougham settled Dunbar's claim as represented by the four notes at the escrow department of the Chicago Title & Trust Company, on November 30, 1904, and it is the settlement thus made which the bill was filed to set aside.

At that time, Dunbar was represented by attorneys Furber & Wakelee, and the terms of the agreement, or settlement, were arranged between Brougham on one side and these attorneys, representing Dunbar on the other. Dunbar alleges that he understood that he was to receive in this settlement twenty-seven per cent. of his claim in cash, sixteen per cent. thereof in property designated as Park avenue property, and the balance in land in La Grange.

Pursuant to this settlement agreement of November 30, 1904, an escrow agreement was entered into by which there was deposited with the Title & Trust Company Dunbar's four notes as representing his claim. The agreement provided that the Title & Trust Company should cancel these notes when it should receive

title to an interest for Charles F. Dunbar in and to land therein described, which interest was not to vest in Dunbar until the Trust Company had received from the Citizens' National Bank of Paintsville, Kentucky, the so-called "Kentucky" notes; when the Kentucky notes were to be delivered to Springer, together with the release of Dunbar's claim against him, and at the same time a declaration of trust, showing Dunbar's interest in the real estate under the escrow agreement so to be delivered to him. No interest in the La Grange land mentioned was conveyed to the Title & Trust Company for complainant after November 30, 1904, the date of the escrow agreement; but on that date, the Trust Company held title to the land in question under a deed from one Deiber and wife, in which deed it was provided that the Trust Company should have full power and authority to manage or dispose of the property in any manner it deemed wise, and that no beneficiary, under said conveyance, should have any interest in the land itself, but only a personal or chattel interest in the proceeds of sale thereof. This deed was dated on the 19th of November, and was acknowledged and recorded on the 26th day of November, 1904. On the 9th of the following month, the Title & Trust Company executed its declaration of trust, reciting that it had acquired title to the property in question and held it in trust for various persons having varying interests therein, and showing that the interest of Dunbar was 38/100. The declaration, however, clearly showed that under it, the beneficiary acquired no interest whatever in the real estate, but became entitled only to a proportionate share of the proceeds of the property when disposed of by the Trust Company. About the 7th of December, 1904, the so-called Kentucky notes were received by the Trust Company to be delivered when an attached sight draft against Dunbar for $10 should be paid, of which the Trust Company notified Dunbar. At about this time, the Trust Company cancelled these four so-called Kentucky

notes, and delivered them to Springer and released him from all further liability to Dunbar, but retained in its possession the Kentucky notes because of the failure of Dunbar to pay the draft of $10, and delivered to Furber & Wakelee, attorneys for Dunbar, the declaration of interest in the land mentioned in the escrow agreement above referred to.

Subsequently, when Dunbar saw the declaration of interest at the office of his attorneys and was informed by them that he was not entitled to any portion of the land, and learned that he was not to receive the twenty-seven per cent. of his debt in cash and sixteen per cent. in Park avenue property as he had supposed he would, he refused to accept the declaration of interest, or to be bound by the settlement. He severed his relations with Furber & Wakelee, his attorneys, and consulted various other attorneys, and, at length, engaged the counsel who filed the bill and have since conducted the litigation.

Prior to the filing of the bill, Brougham contended that Dunbar's claim was entirely settled by the interest in the La Grange land, to which Dunbar was entitled under the deed to the Trust Company and its declaration of trust, which had been delivered to Furber & Wakelee, his attorneys, and that Dunbar was not entitled to receive the twenty-seven per cent. cash, or any other cash at all, nor the sixteen per cent. of the claim in Park avenue property. However, in his answer, he admitted that Dunbar was entitled to receive, in addition to the interest in the La Grange land under the deed to the Trust Company and its declaration of trust, twenty-seven per cent. of his claim in cash, and he declared his willingness to pay it. At the close of the trial, Brougham tendered to Dunbar, in open court, as and for the twenty-seven per cent. of his claim, the sum of $1,177.94, upon condition that Dunbar would assign to Brougham his interest in about two acres of the La Grange land, as described in the escrow agreement and declaration of trust, it being

claimed that Dunbar's interest had included these two acres because of an error in computation.

At the trial, Brougham also tendered in open court the sum of $372.75, being the difference between the claim of Dunbar and the value figured at the agreed amount per acre for the interest in land secured to Dunbar by the declaration of trust, which tender was refused by complainant, and thereupon the court dismissed complainant's bill.

In reaching the proper conclusion upon the questions brought before us by this record, we have been aided by oral arguments and briefs and printed arguments made by appellant and each of appellees.

At the threshold of the controversy, appellant's right of action is contested upon the ground that, with full knowledge of the situation, he definitely ratified and approved the settlement of which he now seeks to complain. To correctly decide this contention has required of us a careful examination of the entire record, including the testimony of Dunbar himself, that of his attorneys, Furber and Wakelee, respectively, that of the witnesses for the other parties to the controversy, and the various exhibits in the case. From such examination we think that under the deed to the Chicago Title & Trust Company and its declaration of trust, appellant did not acquire that interest in the land which the escrow agreement contemplated, and to which he supposed himself entitled. Accordingly, had he done nothing which could amount to ratification, and had he promptly disavowed his acceptance of the conditions, and instituted proceedings to set aside the settlement and to secure relief similar to that prayed in this bill, he might have made a case entitling him to the relief prayed. However, we do not decide that question, because we find that appellant has, by his conduct, clearly waived his right to complain of the agreement which was made on his behalf by Furber and Wakelee, his attorneys. Upon this record, we think it altogether possible that Dunbar did not origi-

nally intend such an agreement as was actually consummated, but if, with full knowledge of the situation, he saw fit to ratify an arrangement which diverged from his original intention and understanding, he cannot now be heard to complain, because he elected to accept and ratify the arrangement as made. It appears that Brougham made an agreement by which he ·was to settle with Springer's creditors. For the purpose of raising money to do this, he made sales of the Springer real estate. While thus endeavoring to dispose of the real estate, in September, 1904, he called upon Attorney Furber of Furber & Wakelee, to get Furber to induce his father, a wealthy investor in Chicago real estate, to purchase some of the Springer real estate. Attorney Furber then told Brougham that they had a client, Dunbar (appellant), who had a claim against Springer, which would have to be settled, whereupon Brougham stated that in consideration of Furber's assistance in inducing his father to become a purchaser of some of the Springer property, he would see that Dunbar's claim was taken care of.

Sometime afterward, Brougham proposed to Furber & Wakelee, the attorneys for Dunbar, to settle the Dunbar claim by giving twenty-seven per cent. thereof in cash, and for the remainder an interest in the so-called La Grange land, which was to be put in at a valuation of $350 an acre. At the time this proposition was made to Dunbar in the presence of his attorneys, he was furnished a legal description of the land in question, and its location upon a map, then given to him, was explained, and he was directed by his attorneys to examine the property and ascertain its value. This he did, and reported to his attorneys that he had been informed that the land was worth much more than $350 per acre; and although at first he declined to say whether or not he would accept the proposition, his attorneys testified that within a week or two, he did say he would accept it.

From the testimony, it appears that the escrow

agreement in question was afterwards drawn up and discussed by a representative of the Trust Company with Mr. Wakelee, representing Mr. Dunbar, by Mr. Springer's attorney, and by Mr. Dunbar himself, and the terms of the escrow agreement were read over to him, and were discussed in his presence, and he thoroughly understood the import of the agreement; and, afterwards, on about the 9th of December, 1904, the Trust Company, pursuant to the trust agreement, sent to Furber & Wakelee, his attorneys, for Dunbar, the declaration of interest. Upon receipt of this, Mr. Dunbar was called into their office and the legal effect of the declaration of interest was explained to him. It is important also to note that at the time, when the declaration of interest was explained to Mr. Dunbar by his attorneys, and also when the trust agreement was signed in the office of the Trust Company, it was observed by Dunbar's attorneys, and by them explained to Dunbar, that an error had crept into the escrow agreement, and also the declaration of interest, respecting the amount of the interest in the La Grange land which Dunbar was to receive. This error consisted in the recital that Mr. Dunbar was to receive a 38/100 interest in the La Grange land, when, in fact, he was entitled to .3033 thereof. By agreement, Mr. Dunbar was to receive twenty-seven per cent. of his claim in cash, and the balance, seventy-three per cent. of his claim, in an interest in the La Grange land, to be taken at an agreed valuation of $350 per acre. The La Grange tract contained thirty acres, at an aggregate agreed value of $10,500; seventy-three per cent. of Dunbar's claim is $3,184.81. It is easy to see, therefore, that the escrow and the declaration of interest were erroneous to the extent indicated. Almost a year after this transaction Dunbar called upon his attorneys, Furber & Wakelee, with respect to having the settlement carried out. To avoid any misunderstanding as to what their client directed them to do, his attorneys made a written memorandum of the instruc-

tions given them by him on that occasion. It seems that the memorandum, as originally drawn, showed "25%" (figures only), as being the amount he was to receive in cash, which was there changed to twenty-seven per cent. Dunbar's attorneys, Furber & Wakelee, both testified as to the conversation then had with Dunbar, and of their then making a memorandum of their instructions, which was offered in evidence, and which reads as follows:

"Go to Brougham, try and secure readjustment of proportions of land and cash so as to make the cash item 27% of claim. Then collect the money, and let Western Springs property agreement stand, whereby Mr. Dunbar will receive 27% cash and the remainder of interest in Western Springs property. Dated November 4, 1905."

On the opposite side of this paper was the following:

"This paper was read to Mr. Dunbar by H. J. Furber and afterwards by H. W. Wakelee, who at the request of Mr. Dunbar eliminated the words '25%' when it appeared.

(Signed)   H. J. FURBER, JR.,

H. W. WAKELEE.

November 4, 1905."

Acting upon these instructions, his attorneys arranged with Brougham to prepare a paper to correct the error in the declaration of interest, by which paper, Mr. Dunbar was to convey to Mr. Brougham an undivided 7/100 interest (that being the excess over what he was entitled to) in the La Grange land. This paper was subsequently given to Mr. Dunbar by his attorneys, who told him that when he executed it, he would receive the twenty-seven per cent. of his claim in cash, and it was with reference to effectuating the correction of the error in the escrow agreement and in the declaration of interest, and to comply with the terms of his agreement, that Brougham made his tenders, above referred to, at the time of the trial.

From the testimony it appears that on the 23rd of December, 1904, Dunbar's attorneys had sent him a bill for $1,000 for professional services in the matter of the Springer controversy. He called at their office and negotiations were had, resulting in their making a settlement of their claim against him, and on January 20, 1905, he paid them $500 in money, and they gave him a receipt which embodied the terms of their agreement on that date. This receipt reads as follows:

"Received of Charles F. Dunbar $500.00 on account, for legal services in the matter of the Warren Springer notes. $125.00 further is payment in full to be paid contingently, either upon the adjustment of this claim upon the basis of the cash and land settlement now pending, or upon the restitution to the client of said notes, as client may elect."

Mr. Wakelee, one of his attorneys, testified that the statement in the receipt, that $125 further was to be paid upon the adjustment of the claim "upon the basis of the cash and land settlement now pending" meant the twenty-seven per cent. cash, and the balance in La Grange land, and that the settlement involved the correction of the papers so that Dunbar's interest in the La Grange land would be reduced from 38/100 to .3033. This document here in evidence, in connection with the testimony of the witnesses, clearly convinces us that Dunbar fully understood the situation in December, 1904, and in January, 1905, and that nearly ten months afterwards, he definitely and clearly instructed his attorneys to secure a readjustment of the proportions of the land and cash so as to make the cash item twenty-seven per cent. of the claim, and that, whether or not he had previously affirmatively and clearly assented to the agreement, he must be held to have expressly ratified and approved it at this time.

Having reached this conclusion, it follows that we must hold that the court below properly dismissed the bill, and its decree will, therefore, be affirmed.

*Decree affirmed.*